IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 22-cv-00220-PAB-KAS

M.P., a minor, by and through his parents and next friends, JARED P., and SARAH P.,

     Plaintiffs,

v.

TERRENCE JONES, Town of Timnath Chief of Police, in his official capacity,
ANDREW TOPE, Town of Timnath Deputy Police Officer and School Resource Officer, in his individual capacity,
GABRIELA PONCE, Town of Timnath Deputy Police Officer and School Resource Officer, in her individual capacity,

     Defendants.

---

## ORDER

---

This matter is before the Court on Defendants Jones, Tope, and Ponce's Motion to Dismiss Plaintiffs' Amended Complaint and Jury Demand (ECF 18) [Docket No. 28]. Defendants invoke qualified immunity and also seek to dismiss plaintiffs' amended complaint for failure to state a claim upon which relief can be granted. *Id.* The amended complaint, Docket No. 18, brought by plaintiff M.P., a minor child, by and through his parents, asserts claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and the Fourth Amendment pursuant to 42 U.S.C. § 1983. Docket No. 18 at 12-17, ¶¶ 50-81. The Court has jurisdiction under 28 U.S.C. § 1331.

## I. FACTUAL BACKGROUND[1]

This case arises out of an incident that took place at Bethke Elementary School, in the Poudre School District of Larimer County, Colorado, involving M.P., an eleven-year-old boy, and two school resource officers ("SROs"), Andrew Tope and Gabriela Ponce. *Id.* at 1, ¶ 1. M.P. has an emotional disability and attention-deficit/hyperactivity disorder ("ADHD"). *Id.* at 4, ¶ 16. SRO Tope and SRO Ponce are employees of both the Poudre School District[2] and the Timnath Police Department. *Id.* at 10, ¶ 35. Defendant Terrance Jones is the Department's Chief of Police. *Id.* at 3, ¶ 10.

On the morning of January 28, 2020, M.P. had been instructed by staff to stay in a separate classroom and not to return to his general education classroom. *Id.* at 4, ¶ 19. However, M.P. returned to his regular classroom and refused to leave it when he was asked to do so. *Id.*, ¶ 20. The school principal, Principal Alfonso, informed SRO Tope and SRO Ponce, who were on "foot patrol," that M.P.'s teacher would be escorting M.P. from his regular classroom to the counselor's office. *Id.*, ¶ 22. Principal Alfonso asked the SROs to go to the stairwell at the rear of the building to prevent M.P. from exiting, informing the officers that one of M.P.'s disability-related behaviors was attempting to escape from challenging situations. *Id.* at 4-5, ¶ 23. SRO Ponce stood by the exit door as Principal Alfonso requested, but SRO Tope remained in the hallway outside M.P.'s classroom. *Id.* at 5, ¶ 24.

---

[1] The facts below are taken from plaintiffs' amended complaint (referred to herein simply as the "complaint"), Docket No. 18, and are presumed to be true, unless otherwise noted, for purposes of ruling on defendants' motion to dismiss.

[2] Plaintiffs' complaint names Poudre School District R-1 as a defendant, but plaintiffs have since dismissed the school district from the case. Docket Nos. 62, 66.

M.P.'s teacher left the classroom with M.P. to bring him to the counselor's office. *Id.*, ¶ 25.  SRO Tope claims that he observed M.P. take his jacket off and swing it around, which SRO Tope felt M.P. was doing intentionally.  *Id.*, ¶ 26.  SRO Tope then lifted M.P. by the shoulders and carried him from the hallway into a separate classroom. *Id.*  The action by SRO Tope caused M.P. to escalate emotionally and "struggle to protect himself."  *Id.*  School staff then directed SRO Tope to remain outside the room while they implemented the de-escalation techniques set forth in M.P.'s behavior support plan in order to help M.P. calm down.  *Id.*, ¶ 27.

With the help of his teachers, M.P. calmed down.  *Id.*  However, due to his disability-related challenges, M.P. went through periods of calm and then periods of escalation, to which M.P.'s teachers would implement the behavior support strategies set forth in M.P.'s behavior intervention plan.  *Id.* at 2, ¶ 3.  Despite the teachers' request that SRO Tope stay outside, SRO Tope and SRO Ponce entered the room, forced M.P. to the ground, and placed his hands in handcuffs behind his back.  *Id.* at 5, ¶ 28.  The officers carried M.P. down the hall and out of the building, placing him in the back of their patrol car.  *Id.* at 6, ¶ 29.  M.P. was transported by ambulance to the Poudre Valley Hospital and was treated for physical injuries he sustained during the altercation.  *Id.*, ¶ 31.  M.P. was ultimately charged with assaulting SRO Tope, obstructing the duties of SRO Tope and SRO Ponce, and interfering with the education of staff and students.  *Id.*, ¶ 32.

At the time of the incident, M.P. was frightened, confused, and in a state of panic. *Id.*, ¶ 30.  Since then, M.P. has exhibited permanent and serious emotional injuries.  *Id.*, ¶ 33.  M.P. experienced an emotional breakdown in the Spring of 2021 that required in-

3

patient psychiatric hospitalization and placement in an out-of-state residential treatment facility and suffers from Post Traumatic Stress Disorder ("PTSD") and anxiety.  *Id.* at 6-7, ¶¶ 33a, 33c, 33e.  Since the incident, M.P. has been emotionally unable to attend school except for brief and inconsistent periods of time, and he has been receiving significant psychiatric treatment, including treatment specifically targeted to alleviate emotional distress associated with trauma.  *Id.*, ¶¶ 33b, 33d.  M.P.'s parents claim that M.P. changed the day of the incident in that his anxiety symptoms increased dramatically.  *Id.*, ¶ 33c.  He became fearful of abduction by strangers and going into public spaces, his ability to regulate his emotions and behavior decreased, and he became increasingly angry and violent.  *Id.*

## II.  LEGAL STANDARD

### A.  Motion to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)).  The Court must "accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff."  *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007).  However, if a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then the plaintiff has not stated a plausible claim.  *Id.* at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a

4

recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alterations omitted).

### B.  Qualified Immunity

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard.  *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)).  When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).  Courts are "permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.

## III.  FOURTH AMENDMENT CLAIM

Plaintiffs' third claim for relief alleges that SRO Tope and SRO Ponce violated M.P.'s constitutional rights under the Fourth Amendment.  Docket No. 18 at 15-17, ¶¶ 72-81.  They allege that the SROs "unreasonably and unconstitutionally seized M.P., and also used excessive force in their seizure of M.P."  *Id.* at 16, ¶ 76.  Plaintiffs further allege that Chief Jones "failed to adequately train and supervise SROs" and that his "deliberately indifferent failure to train was a proximate cause of the violations of M.P.'s Fourth Amendment rights."  *Id.* at 16-17, ¶ 79.  The Court will consider plaintiffs' claims for unlawful seizure, excessive force, and failure to train separately.  *See Mglej v. Gardner*, 974 F.3d 1151, 1165 (10th Cir. 2020) (holding that an excessive force claim is separate from a claim for unlawful arrest).

### A.  Unlawful Seizure by SRO Tope and SRO Ponce

Plaintiffs' third claim for relief alleges that SRO Tope and SRO Ponce unlawfully seized M.P. in violation of his Fourth Amendment rights.  Docket No. 18 at 15, ¶¶ 73-74. Defendants claim that SRO Tope and SRO Ponce are entitled to qualified immunity on this claim.  Docket No. 28 at 17-18.  Accordingly, the Court will apply a qualified immunity analysis to plaintiffs' claim for unlawful seizure.

#### 1.  Constitutional Violation

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

6

shall not be violated." U.S. Const. Amend. IV.  Accordingly, the Fourth Amendment "prohibits government officials from detaining a person in the absence of probable cause." *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367 (2017).  To assert a plausible claim for unlawful seizure under the Fourth Amendment, a plaintiff must "state facts which, if true, would establish that there was no warrant, probable cause, or other exigent circumstances rendering the [search or seizure] permissible." *Sanchez v. Bauer*, No. 14-cv-02804-MSK-KLM, 2015 WL 5026195, at *4 (D. Colo. Aug. 26, 2015); *see also Erikson v. Pawnee County*, 263 F.3d 1151, 1154 (10th Cir. 2001) (affirming dismissal of Fourth Amendment claim where, "beyond the conclusory allegation in his complaint that no probable cause existed, plaintiff ha[d] not alleged any specific facts showing there was a lack of probable cause for his arrest and prosecution").

"Probable cause exists if facts and circumstances within the . . . officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (internal quotation marks omitted).   However, probable cause does not require "an actual showing of [criminal] activity," but rather "a probability or substantial chance of criminal activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).

Probable cause is determined according to an objective standard. *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004).  When determining whether an officer has probable cause for an arrest, a court must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of*

7

*Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotations marks and citation omitted); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) ("Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995))).

"When a warrantless arrest or seizure is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007) (en banc).  Accordingly, to state a claim for unlawful seizure that survives the SROs' invocation of qualified immunity, plaintiffs must allege facts which, if true, would establish that no objectively reasonable SRO would believe that M.P. had committed or was committing an offense.[3]

### a.  Interfering with the Education of School Staff and Students

Defendants claim that SRO Tope had probable cause to arrest M.P. for interfering with the education of school staff and students.  Docket No. 28 at 19. Colorado law prohibits interference with staff, faculty, or students of educational institutions:

> No person shall, on the premises of any educational institution . . . willfully impede the staff or faculty of such institution in the lawful performance of their duties or willfully impede a student of the institution in the lawful pursuit of his educational activities through the use of restraint, abduction, coercion, or intimidation or when force and violence are present or threatened.

---

[3] Defendants do not dispute plaintiffs' allegation that M.P. was seized.  Docket Nos. 28, 47.

Colo. Rev. Stat. § 18-9-109(2).  The Colorado Court of Appeals has held that, in order to prove that a defendant acted "willfully" under this statute, the prosecution must "prove that the defendant knew his conduct was practically certain to impede students from pursuing their educational activities." *People ex rel. J.P.L.*, 49 P.3d 1209, 1211 (Colo. App. 2002) (citation omitted).  In addition, the statute requires the prosecution to prove that the "impeding was accomplished 'through the use of restraint, abduction, coercion, or intimidation,' or that 'force and violence [were] present or threatened.'" *People ex rel. C.A.J.*, 148 P.3d 436, 437 (Colo. App. 2006) (holding that the prosecution must prove this element regardless of whether students or staff and faculty were actually impeded); *see also J.P.L.*, 49 P.3d at 1211 ("the only prohibited conduct is 'the use of restraint, abduction, coercion, or intimidation or when force and violence are present or threatened." (quoting Colo. Rev. Stat. § 18-9-109(2))).

As discussed above, probable cause requires a "probability or substantial chance of criminal activity," *Gates,* 462 U.S. at 243 n.13, and an officer's actions in effectuating an arrest are protected by qualified immunity if a reasonable officer in his position would have believed that probable cause existed. *McCauley*, 478 F.3d at 1120.  Therefore, SRO Tope is not entitled to qualified immunity for his seizure of M.P. in the hallway if, based on the facts alleged in the complaint, no reasonable officer would have believed that M.P. had the necessary mens rea, namely, that he knew his conduct was practically certain to impede students from pursuing their educational activities or staff from performing their duties.  Similarly, SRO Tope is not entitled to qualified immunity if no reasonable officer would have believed that M.P. was using restraint, abduction,

coercion, intimidation, force, violence, or the threat of force or violence. *See* Colo. Rev. Stat. § 18-9-109(2).

The complaint describes the circumstances leading up to SRO Tope's seizure of M.P.: that Principal Alfonso told SRO Tope that "M.P. was supposed to check in with his counselor in the morning but had refused and instead had gone to his classroom and that M.P.'s teacher was going to be bringing M.P. to the counselor's office," Docket No. 18 at 4, ¶ 22; that SRO Tope "observed M.P.'s teacher, Courtney Hill, leave the classroom with M.P. to bring him down to the counselor's office," *id.* at 5, ¶ 25; that SRO Tope "claims he observed M.P. take his jacket off and start swinging it around" and that SRO Tope "felt M.P. was doing this intentionally," *id.*, ¶ 26; and that SRO Tope seized M.P. for this reason. *Id.*

Defendants claim that M.P.'s return to his regular classroom, contrary to staff instruction, refusal to leave that classroom, and swinging of his jacket constitute probable cause to arrest M.P. for violating § 18-9-109(2). Docket No. 28 at 19. The Court disagrees. The complaint does not allege that M.P. used abduction, coercion, intimidation, force, violence, or threats. Rather, the only actions that it alleges M.P. took, before SRO Tope seized him, were disobeying instructions by returning to his regular classroom, refusing to leave, and swinging his jacket. Docket No. 18 at 4-5, ¶¶ 19-20, 26. None of these actions would lead a reasonable officer to believe M.P. was engaging in abduction, coercion, intimidation, force, violence, or threats. *Cf. J.P.L.,* 49 P.3d at 1211 (upholding an adjudication of delinquency under § 18-9-109(2) of a student who repeatedly told classmates that he was going to kill them). The complaint does not state M.P.'s motivations for disobeying instructions or swinging his jacket,

whether anyone but Ms. Hill and SRO Tope were present when he was swinging his jacket, how close Ms. Hill and SRO Tope were to M.P. while he was swinging his jacket, or how Ms. Hill reacted to M.P.'s swinging his jacket.  In the absence of additional details, none of M.P.'s actions, as alleged in the complaint, would have led a reasonable officer to believe that M.P. knew his conduct was "practically certain" to impede students from pursuing their educational activities or staff from lawful performance of their duties and was therefore acting "willfully" under § 18-9-109(2).  *Id.* (holding that willfulness was established by defendant's continued death threats against classmates despite school handbook provisions prohibiting threats, defendant's knowledge that "some students were alarmed by his statements," and the context of "a heightened state of awareness" of threats of violence by students in the aftermath of the Columbine High School shootings).  Accordingly, based on the well-pled allegations in the complaint, no reasonable officer would have believed that at least two of the elements required for prosecution under § 18-9-109(2) were present.  Therefore, no reasonable officer would have believed that probable cause existed to arrest M.P. for violating that statute.  Accordingly, plaintiffs have plausibly alleged that SRO Tope's seizure of M.P. in the hallway violated M.P.'s Fourth Amendment rights.

### b.  Assaulting SRO Tope and Obstructing the Duties of SRO Tope and SRO Ponce

The motion to dismiss does not explain why the SROs had probable cause to arrest M.P. for assaulting SRO Tope and obstructing the duties of SRO Tope and SRO Ponce.  The motion merely states, "not only did probable cause exist to arrest M.P. for interfering with the educational process, but the SROs also charged M.P. for assaulting SRO Tope and obstructing the duties of SROs Tope and Ponce."  Docket No. 28 at 19.

11

Defendants' reply recounts M.P.'s actions leading up to his seizure in the hallway and, in addition, argues that "M.P. struggled with the SROs, which is illegal, even if M.P. was trying to protect himself." Docket No. 47 at 10. The defendants do not identify the law that forbids such struggling or the statutes under which M.P. was charged. Similarly, the defendants do not explain which of M.P.'s actions constitute probable cause for arresting him for assaulting SRO Tope or obstructing the SROs' duties. The reply merely concludes that "M.P.'s actions certainly present arguable probable cause for arrest for assaulting SRO Tope, obstructing the duties of SRO Tope and SRO Ponce, and interfering with the education of school staff and students." *Id.*

That the defendants addressed probable cause for arresting M.P. for assault and obstruction of the SROs in a cursory manner is sufficient reason for the Court to disregard defendants' argument on this point. *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.") (internal quotation and citation omitted).

However, even if the defendants had properly raised the argument, the Court would find that, based on the facts alleged in the complaint, a reasonable officer would not have believed there was probable cause to arrest M.P. for assaulting SRO Tope and obstructing the duties of SRO Tope and SRO Ponce. Under Colorado law, a person commits the crime of assault if that person intentionally, knowingly, or recklessly causes bodily injury to another person, threatens another person with a deadly weapon, or causes another person to come into contact with bodily or hazardous material. Colo. Rev. Stat. §§ 18-3-202, 18-3-203, 18-3-204. The complaint alleges that, before M.P.

was seized by SRO Tope, he had returned to the wrong classroom, refused to leave that classroom, and swung his jacket around.  Docket No. 18 at 4-5, ¶¶ 19-20, 26.  The complaint further alleges that M.P. "struggle[d] to protect himself"[4] when SRO Tope "seize[d] M.P. by the shoulders and carr[ied] M.P. away to a separate room."  *Id.* at 5, ¶ 26.  But the complaint does not allege that M.P.'s struggle caused bodily injury to SRO Tope or that M.P. threatened SRO Tope with a deadly weapon or caused SRO Tope to come in contact with bodily or hazardous material.  Docket No. 18. Accordingly, based on the allegations in the complaint, no reasonable officer would have believed there was probable cause to arrest M.P. for assaulting SRO Tope.  *See Gates,* 462 U.S. at 243 n.13.  Therefore, based on the facts alleged in the complaint, there was no probable cause to arrest M.P. for assaulting SRO Tope.

In Colorado, "[a] person commits obstructing a peace officer . . . when, by using or threatening to use violence, force, physical interference, or an obstacle, such person knowingly obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his or her official authority."  Colo. Rev. Stat. § 18-8-104(1)(a).  The only allegation in the complaint that could constitute "obstruction" of an officer before M.P.'s arrest is the allegation that M.P. "struggle[d] to protect himself" when SRO Tope carried him to a separate room.  Docket No. 18 at 5, ¶ 26.  As discussed above, the complaint does not explain what "struggl[ing] to protect himself" entailed.  However, the complaint does not allege that M.P. used or threatened to use violence, force, physical interference, or an obstacle

---

[4] The complaint does not explain what actions or inactions constituted M.P.'s "struggle to protect himself."  Docket No. 18.

against SRO Tope.  Docket No. 18.  The complaint also does not allege that SRO Tope was obstructed, impaired, or hindered by M.P.'s struggle.  *Id.*  Accordingly, viewing the facts alleged in the complaint in the light most favorable to the plaintiffs, no reasonable SRO would have believed that there was probable cause to arrest M.P. for obstructing SRO Trope based on his struggle while SRO Trope moved him to the separate room. Furthermore, the complaint does not allege that M.P. had any contact with SRO Ponce before he was arrested or that M.P. resisted arrest or struggled when he was moved to the police car.  *Id.*  Therefore, based on the facts alleged in the complaint, no reasonable SRO would have believed that there was probable cause to arrest M.P. for obstructing SRO Tope and SRO Ponce after SRO Tope moved M.P. to the separate room.

### c.  Dropped Charges

Defendants note that the complaint does not allege that the charges against M.P. were dropped.  Docket No. 47 at 9.  For this reason, according to defendants, "it would be reasonable to infer that M.P. either plead [sic] guilty to the charges or was found guilty by a court or jury of those charges," with the result that "M.P. cannot allege a viable unlawful seizure claim."  *Id*.  However, defendants cite no support for this assertion.[5]  Furthermore, at the motion to dismiss stage, the Court must view the

---

[5] Defendants rely on *Guinn v. Unknown Lakewood Police Officers,* No. 10-cv-00827-WYD-CBS, 2010 WL 4740326 (D. Colo. Sept. 30, 2010), to support their assertion that a plaintiff must plead that the charges against him were dropped to establish a viable unlawful seizure claim.  However, the court in *Guinn* found that the plaintiff could not allege that the arresting officers lacked probable cause because he had pled guilty to the charges and his guilty plea established probable cause.  *Id.* at *6. Plaintiffs' failure to indicate whether charges against M.P. were dropped is not comparable to the *Guinn* plaintiff's guilty plea, which distinguishes *Guinn*.

pleadings in the light most favorable to plaintiffs.  Therefore, the Court will not infer from

the complaint's silence on the issue that M.P. pled guilty or was found guilty of the

charges against him.  Accordingly, the Court finds that plaintiffs have plausibly alleged

that the SROs unlawfully seized and arrested M.P. in violation of the Fourth

Amendment.

### 2.  Clearly Established Law

It is clearly established that the Fourth Amendment "prohibits government

officials from detaining a person in the absence of probable cause."  *Manuel,* 580 U.S.

at 367.  However, defendants do not argue that M.P.'s right to be free from seizure

without probable cause under the relevant statutes was not clearly established at the

time of the violation.  Accordingly, the Court need not engage in a lengthy analysis on

this point.  *See Marck v. City of Aurora,* No. 21-cv-01071-WJM-SKC, 2022 WL 889175,

at *6 n.3 (D. Colo. Mar. 25, 2022) (declining to engage in qualified immunity analysis on

a motion to dismiss where "Officer Defendants have not provided the Court with any

legal analysis regarding whether [plaintiff's] right to be free from arrest without probable

cause was clearly established in the circumstances presented in this case"); *Custard v.

Balsick,* No. 15-cv-02221-REB-CBS, 2017 WL 131799, at *21 (D. Colo. Jan. 13, 2017)

(internal citation omitted) ("Defendants provide no reasoning for why they believe a

reasonable prison officer would not have understood that the conduct . . . would violate

the Eighth Amendment.  Without any analysis or application of the caselaw that existed

[at the time of the violation] to each set of facts that Plaintiff alleges, Defendants'

argument is too cursory for the court to address at this time.").  Therefore, the Court

does not find that defendants are entitled to qualified immunity.  Accordingly, the Court

finds that, based on the well-pled allegations in the complaint, the plaintiffs have stated a claim for unlawful seizure in violation of the Fourth Amendment.

## B.  Excessive Force by SRO Tope and SRO Ponce

Plaintiffs' third cause of action alleges that the SROs used excessive force when seizing M.P. in violation of the Fourth Amendment.  Docket No. 18 at 15-16, ¶¶ 75-76. Defendants claim that the SROs are entitled to qualified immunity on plaintiffs' excessive force claim.  Docket No. 28 at 18.  Accordingly, the Court will apply a qualified immunity analysis.

### 1.  Constitutional Violation

"To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a seizure occurred and that the seizure was unreasonable."  *Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994) (quotation omitted).  The relevant inquiry is whether the force used by the officers was "reasonable under the facts and circumstances presented."  *See Fogarty v. Gallegos*, 523 F.3d 1147, 1159 (10th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  When examining a claim of excessive force, a "court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances."  *Buck v. City of Albuquerque*, 549 F.3d 1269, 1287-88 (10th Cir. 2008) (quoting *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005)).  In *Graham*, the Supreme Court laid out three, non-exclusive factors to consider when determining whether officers used excessive force on an arrestee: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3)

whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

Plaintiffs claim that SRO Tope and SRO Ponce used excessive force against M.P. in violation of the Fourth Amendment by "physically seizing him and carrying [him] by his shoulders to another room in the school building, violently forcing M.P. to the ground and handcuffing M.P., and then forcing him to remain handcuffed and restrained for an excessively lengthy period of time causing serious bodily injury." Docket No. 18 at 15-16, ¶¶ 75-77. Defendants argue that plaintiffs' claim fails because the complaint does not "describe what specific [physical] injuries M.P. allegedly sustained" and "the right to arrest carries with it the right to use some degree of force and . . . arrests will most often involve some form of physical contact." Docket No. 28 at 21-22 (citing *Graham*, 490 U.S. at 296). However, defendants cite no support for the argument that *Graham*—or any other precedent—requires plaintiffs to describe their physical injuries with specificity in order to state a claim for excessive force. Therefore, the Court will not dismiss plaintiffs' claim for excessive force on this basis.

Defendants also argue that plaintiffs have failed to plead an excessive force violation because "M.P.'s arrest was based on probable cause and actions of SROs during the arrest were reasonable under the circumstances." *Id*. at 20. As discussed above, based on the allegations in the complaint, no reasonable officer would have believed there was probable cause to arrest M.P. Accordingly, the Court will consider

only defendants' argument that the SROs' actions were reasonable under the circumstances. [6]

### a. Moving M.P. to a Separate Room

Defendants do not make any argument specific to plaintiffs' claim that SRO Tope used excessive force in violation of the Fourth Amendment when he lifted M.P. by the shoulders and carried him to another room.  Docket No. 28.  Accordingly, the Court will not dismiss plaintiffs' claim for excessive force as it applies to their allegations about SRO Tope moving M.P. to a separate room.

### b. Forcing M.P. to the Ground

Plaintiffs allege that, while M.P.'s teachers were implementing de-escalation techniques to calm M.P. down in a separate room, the SROs "burst into the room unannounced and uninvited and violently forced M.P. to the ground and forcibly placed M.P. in handcuffs behind his back."  Docket No. 18 at 5, ¶ 28.

Defendants appear to make two arguments concerning forcing M.P. to the ground.  First, they argue that "the SROs had probable cause to at least arrest M.P. for interfering with the educational process" and that "[t]he actions of the SROs were reasonable under the circumstances because they effectuated a lawful arrest."  Docket No. 28 at 21.  However, where a plaintiff alleges both excessive force and unlawful arrest, the Court "must conduct a separate and independent inquiry" into the excessive

---

[6] Defendants also appear to argue that plaintiffs are not entitled to damages based on M.P.'s residential treatment hospitalization because it was too remote in time from his arrest and the SROs used a reasonable amount of force when arresting M.P. Docket No. 28 at 22.  However, the amount of damages that plaintiffs may be entitled to, should they prevail, is irrelevant to whether plaintiffs have stated a claim for excessive force.  Accordingly, the Court will not consider this argument for the purposes of ruling on defendants' motion.

force claim regardless of whether the arrest was unlawful.  *Mglej*, 974 F.3d 1165.

Accordingly, whether the SROs had probable cause to arrest M.P. is irrelevant to

whether they used excessive force to do so.

Second, defendants argue that "the SROs used a reasonable amount of force

under the circumstances."  Docket No. 28 at 22.  The circumstances that defendants

identify are that "M.P. . . . previously refused to follow school personnel orders and

aggressively swung his jacket."  *Id.* at 21.  The Court applies the *Graham* factors to

determine whether the force used was reasonable given these circumstances.

The first *Graham* factor is the severity of the crime at issue.  *Graham*, 490 U.S. at

396.  The actions by M.P.—disobeying directions and swinging his jacket—that

defendants claim justify the SROs' use of force go to the crime of interfering with the

educational process under § 18-9-109(2).  A violation of § 18-9-109(2) is a class 2

misdemeanor.  Colo. Rev. Stat. § 18-9-109(5)(a).  The Tenth Circuit has held that the

first Graham factor "weighs against the use of 'anything more than minimal force'"

where a plaintiff is suspected of a crime that is punishable as a class two misdemeanor

under Colorado law.  *Jordan v. Jenkins*, 73 F.4th 1162, 1172 (10th Cir. 2023).  The

Tenth Circuit also held that a "takedown maneuver" is more than minimal force.  *Id.* at

1172-73.  Plaintiffs allege that M.P. was subject to a "violent take down" by the SROs.

Docket No. 18 at 6, ¶ 32.  Accordingly, the first *Graham* factor weighs in favor of

plaintiffs.

The second *Graham* factor is whether the suspect posed an immediate threat to

the safety of the officers or others.  *Graham*, 490 U.S. at 396.  The Tenth Circuit has

held that this factor is the "most important."  *Jordan*, 73 F.4th at 1173 (quoting *Wilkins v.*

19

*City of Tulsa,* 33 F.4th 1265, 1273 (10th Cir. 2022) (quoting *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017))).  Defendants argue that "[o]fficers can use a takedown to control the escalating threat to themselves and others during arrest," but they do not identify any allegation in the complaint that there was an "escalating threat."  Docket No. 28 at 21.  The complaint alleges that, at the time that the SROs entered the separate room, M.P.'s teachers were able to calm him down using techniques prescribed by his behavior support plan.  Docket No. 18 at 2, 5, ¶¶ 3, 27-28.  Although the complaint alleges that M.P. "had periods where he would briefly escalate, whereby the teachers would again implement the prescribed de-escalation techniques," *id.* at 5, ¶ 27, there are no allegations that M.P. threatened the safety of his teachers or the SROs.  Accordingly, the second *Graham* factor weighs in favor of plaintiffs.

The third *Graham* factor is whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  *Graham,* 490 U.S. at 396.  The complaint alleges that, before the SROs entered the room, M.P.'s teachers were implementing de-escalation techniques and that M.P. calmed down, though he "had periods where he would briefly escalate."  Docket No. 18 at 2, 5, ¶¶ 3, 27.  The complaint contains no allegations that M.P. was attempting to flee when the SROs entered the room.  Likewise, the complaint contains no allegations that M.P. was actively resisting arrest at that time.  Accordingly, the third *Graham* factor weighs in favor of plaintiffs.

Because the Court finds that, based on the well-pleaded allegations in the complaint, all three *Graham* factors weigh in favor of plaintiffs, plaintiffs have sufficiently alleged that the SROs used excessive force in violation of the Fourth Amendment when they forced M.P. to the ground.

## 2.  Clearly Established Law

As discussed above, plaintiffs' complaint alleges that, while M.P. was in a separate room with his teachers, who were calming him down using de-escalation techniques, the SROs entered the room, forced M.P. to the ground, and placed him in handcuffs.  *Id.* at 5, ¶¶ 27-28.  The complaint contains no allegations indicating that M.P. posed a threat, put up resistance, or was attempting to flee when the SROs executed the takedown.  Defendants argue that SRO Tope and SRO Ponce "performed a generic takedown of M.P. which was followed by standard handcuffing," and that no specific caselaw exists that would prohibit SROs from taking such action.  Docket No. 28 at 24.  However, in *Morris v. Noe,* 672 F.3d 1185, 1198 (10th Cir. 2012), the Tenth Circuit held that officers used excessive force in violation of the Fourth Amendment when they performed a "forceful takedown" and handcuffed a defendant who was suspected of a misdemeanor, posed no threat to the officers, and did not resist or flee. *See also Johnson*, 73 F.4th at 1174 ("*Morris* thus establishes that a takedown maneuver is unconstitutional when the arrestee poses no threat, puts up no resistance, and does not attempt to flee.").  Thus, it was clearly established at the time of M.P.'s arrest that it would violate M.P.'s rights under the Fourth Amendment to take him down and handcuff him in the circumstances alleged in the complaint.  Therefore, the Court finds that SRO Tope and SRO Ponce are not entitled to qualified immunity on plaintiffs' excessive force claim.

### C.  Liability of Police Chief Jones For the Acts of SROs

Plaintiffs claim that Police Chief Jones is liable in his official capacity for the actions of SRO Tope and SRO Ponce because his "deliberately indifferent failure to

train was a proximate cause of the violations of M.P.'s Fourth Amendment rights." Docket No. 18 at 16-17, ¶ 79. "A suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same." *Watson v. City of Kansas City, Kan.,* 857 F.2d 690, 695 (10th Cir. 1988) (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985), and *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 n.55 (1978)). Therefore, the Court will discuss plaintiffs' claim against Chief Jones in his official capacity in terms of a claim alleged against a municipality.

Municipalities may not be sued under 42 U.S.C. § 1983 on a theory of respondeat superior. *Monell*, 436 U.S. at 692. Instead, local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. at 690. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694.

In order to state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). A municipal policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions

22

of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

A plaintiff must also demonstrate "a direct causal link between the policy or custom and the injury alleged." *Id.* (internal quotation marks omitted). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (internal quotation marks omitted).

### 1. Constitutional Violation

To maintain a *Monell* claim, a plaintiff must first show that a municipal employee violated the plaintiff's constitutional rights. *See Jiron*, 392 F.3d at 419. As detailed above, the Court has found that plaintiffs have adequately pled constitutional violations against SRO Tope and SRO Ponce for unlawful seizure and excessive force. The first element of the *Monell* claim has therefore been met.

### 2.  Municipal Policy or Custom – Failure to Train

To state a *Monell* claim based on the failure to train or supervise, "a plaintiff must sufficiently allege that the failure 'amounts to deliberate indifference to the rights of persons with whom the police come into contact.'"  *Rehberg v. City of Pueblo*, No. 10-cv-00261-LTB-KLM, 2012 WL 1326575, at *4 (D. Colo. Apr. 17, 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  However, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Okla. City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion) (discussing how a policy of inadequate training is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

"Deliberate indifference" is an exacting standard of fault.  *See Bryan Cnty.*, 520 U.S. at 410.  It requires showing that a municipal actor disregarded a known or obvious consequence of his action.  *Id.*  "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."  *Connick*, 563 U.S. at 61. "Deliberate indifference" for purposes of failure-to-train ordinarily necessitates a showing of a pattern of similar constitutional violations by untrained employees.  *See Bryan Cnty.*, 520 U.S. at 409.  Therefore, to proceed on a failure-to-train theory, plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Jenkins v.*

24

*Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quoting *Canton*, 489 U.S. at 390). Notice of particular deficiencies in a training program is the crux of a failure-to-train theory because, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Plaintiffs allege that Chief Jones is liable for the SROs' constitutional violations because the moving force of their actions was a failure to train them. Docket No. 18 at 16-17, ¶ 79. Plaintiffs allege that Chief Jones was or should have been "aware, based on . . . statistical data and specific incidents, that [the] lack of training for SROs posed a risk that students' rights would be violated, and that further training regarding interacting with students with disabilities was needed to prevent or reduce that risk." *Id.* at 11, ¶ 40. However, plaintiffs do not identify the "statistical data" or "specific incidents" that would have constituted notice to Chief Jones that the training that SRO Tope and SRO Ponce received was deficient. Accordingly, this cursory reference to statistics and specific incidents is not sufficient to support a failure-to-train claim against Chief Jones.

Plaintiffs also argue that they have plausibly alleged that Chief Jones had notice that further training regarding putting children with disabilities in restraints was required because they alleged the existence of "national studies and statistics, U.S. Department of Education reports and initiatives, and news stories" on the topic. Docket No. 39 at 28; *see* Docket No. 18 at 11-12, ¶¶ 41-47. However, plaintiffs offer no support for the premise that the existence of national studies, statistics, reports, initiatives, and news stories, without more, would put Chief Jones on notice that his SRO training program was deficient. *See Mann v. Palmerton Area School Dist.*, 872 F.3d 165, 175 (3rd Cir.

2017) (finding plaintiffs did not establish defendant school district's failure to train coaches to respond to concussions by submitting national news articles on concussion risk and the concussion policies of other school districts in absence of evidence showing a pattern of recurring head injuries in the defendant school district); *cf.* *Edwards v. City of New York*, 2015 WL 5052637, at *5 (S.D.N.Y. Aug. 27, 2015) (plaintiff alleged failure to train New York City Department of Corrections officers where "a litany of sources," including civil lawsuits, official testimony, a U.S. Attorney report, and news articles discussing use of force by New York City Department of Corrections officers, "show[ed] the City's acute awareness of the pervasive use of excessive force" by those officers). Accordingly, plaintiffs have failed to plausibly allege the notice requirement for their *Monell* failure-to-train claim.

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick,* 563 U.S. at 62 (quoting *Bryan Cnty.*, 520 U.S. at 409). Plaintiffs' complaint alleges that "the School District and the Timnath Police Department have a pattern and practice of their employees and agents mishandling situations involving students with disabilities – especially students with serious emotional disabilities – and have a pattern and practice of disproportionately putting children with disabilities into restraints, secluding them, and referring them to law enforcement." Docket No. 18 at 10-11, ¶ 39. This allegation, however, is conclusory because plaintiffs have failed to identify even a single incident that could constitute a "pattern and practice" of interactions between municipal employees and students with disabilities that resembled what happened with M.P. *See Connick,* 563 U.S. at 62; *Williams v. City of Aurora*, No. 19-cv-02539-RM-

STV, 2020 WL 9078349, at *12 (D. Colo. Apr. 27, 2020) ("The conclusory nature of the allegations, coupled with a failure to provide specific instances of a pattern and practice of excessive force, renders Plaintiff's [Monell claim] deficient."), *report and recommendation adopted*, 2021 WL 973388, at *5 (D. Colo. Mar. 16, 2021); *cf. Eaves v. El Paso Cnty.*, No. 16-cv-01065-KLM, 2021 WL 5037485, at *6-7 (D. Colo. Oct. 19, 2021) (denying summary judgment of *Monell* claim where plaintiff identified sixteen specific use-of-force incidents and explained why they were similar to the incident at issue in his case).  Accordingly, plaintiffs have failed to plausibly allege a pattern or practice by municipal employees that could subject Chief Jones to *Monell* liability.

Because plaintiffs have not plausibly alleged that Chief Jones had notice that the SROs' training was deficient or that there was a pattern and practice of constitutional violations by SROs, the Court will dismiss plaintiffs' Fourth Amendment claim against Chief Jones.

## IV.  ADA AND RA CLAIMS

Plaintiffs' first claim alleges a violation of the ADA and their second claim alleges a violation of the RA.  Docket No. 18 at 12-15, ¶¶ 50-71.  Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The RA contains a nearly identical provision.  29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance.").  "Because these provisions involve the same substantive standards, [courts] analyze them together."  *Miller ex rel. S.M. v. Board of Educ. of Albuquerque Public Schools*, 565 F.3d 1232, 1245 (10th Cir. 2009).

"To state a claim under Title II of the ADA, a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability."  *A.V. ex rel. Hanson v. Douglas Cnty. Sch. Dist. RE-1*, 586 F. Supp. 3d 1053, 1062 (D. Colo. 2022).

## A.  M.P.'s Disability

Plaintiffs' complaint alleges that M.P. has an emotional disability and ADHD and that he is therefore an individual with disabilities under the RA and ADA.  Docket No. 18 at 4, ¶¶ 16, 18.  Defendants dispute plaintiffs' allegation that M.P. is disabled within the meaning of the ADA by citing caselaw from outside this circuit where courts have found that ADHD or other learning disabilities, by themselves, do not qualify for ADA protection.  Docket No. 28 at 13-14.  However, this caselaw is distinguishable since plaintiffs have alleged that M.P. has both "serious emotional disabilities and ADHD." *See* Docket No. 18 at 13, ¶ 52.  Based on plaintiffs' well-pled allegations, plaintiffs have plausibly alleged the first prong required to establish ADA and RA claims.

## B.  M.P.'s Arrest

Although the Tenth Circuit has not decided the viability of an ADA claim based on an arrest, *Clark v. Colbert,* 895 F.3d 1258, 1265 (10th Cir. 2018) ("we have never squarely held the ADA applies to arrests"), it has nevertheless identified two potential

theories of ADA claims arising from arrests. *Gohier v. Enright,* 186 F.3d 1216, 1220-21 (10th Cir. 1999). First, a claim may arise when "police wrongly arrest[] someone with a disability because they misperceived the effects of that disability as criminal activity." *Id.* at 1220. However, such an arrest does not violate the ADA if the arrestee's actions were in fact unlawful even though they were the effects of a disability. *See J.H. ex rel. J.P. v. Bernalillo Cnty.*, 806 F.3d 1255, 1260 (10th Cir. 2015) (finding no discrimination under the ADA where police arrested a student with disabilities for battery because "[i]t was that battery, rather than a disability, that led to the arrest"). Second, a claim may arise when police "fail[] to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Gohier,* 186 F.3d at 1220-21. Plaintiffs argue that their complaint states a claim for violation of the ADA and RA under both theories. Docket No. 39 at 9-13.

### *1. Wrongful Arrest*

A disabled arrestee may bring a claim under the ADA if the arresting officers misperceived the effects of the arrestee's disability as criminal activity, such as "arrest[ing] for drunk driving a man who was sober, and whose unsteadiness and slurred speech resulted from a past stroke." *Gohier,* 186 F.3d at 1220-21 (citing *Jackson v. Inhabitants of the Town of Sanford,* 1994 WL 589617, at *1 (D. Maine Sep. 23, 1994)). However, officers do not violate the ADA under the wrongful arrest theory when they arrest a disabled individual whose conduct was in fact unlawful, even if it was an effect of the arrestee's disability. *Scott v. City of Albuquerque,* 711 F. App'x 871, 884-85 (10th Cir. 2017) (unpublished); *J.H.,* 806 F.3d at 1260. Based on this principle,

defendants argue that plaintiffs have failed to allege that the SROs violated the ADA when they arrested M.P. because they have failed to allege that M.P. was wrongfully arrested.  Docket No. 28 at 12.  Defendants note that the complaint does not allege that charges against M.P. were dropped and urge the Court to "infer that M.P. was lawfully arrested for criminal conduct."  *Id.*  As discussed above, the Court will not infer that M.P. was lawfully arrested based on the complaint's silence on whether the charges against him were dropped.  Furthermore, as discussed above, the Court finds that plaintiffs have stated a claim for unlawful arrest.  The defendants' motion to dismiss raises no other argument as to why M.P.'s ADA and RA claim based on the wrongful arrest theory should be dismissed.  Docket No. 28.  Accordingly, the Court declines to do so.

### 2.  Failure to Accommodate During Arrest

Plaintiffs claim that defendants "denied M.P. reasonable accommodations" and "caused [him] to suffer greater injury and indignity in those processes than others similarly situated."  Docket No. 18 at 13-14, ¶¶ 53-54, 65-66.  A disabled arrestee may bring a claim under the ADA based on a "failure to accommodate" theory if the police "failed to reasonably accommodate the person's disability in the course of . . . arrest, causing the person to suffer greater injury or indignity in that process than other arrestees."  *Gohier*, 186 F.3d at 1220-1222 (citing *Gorman v. Bartch,* 152 F.3d 907, 912-13 (8th Cir. 1998) (reversing dismissal of an ADA claim brought by paraplegic plaintiff alleging that police had transported him to the police station in a vehicle unequipped to safely accommodate people using wheelchairs).  A disabled plaintiff may bring a claim under this theory even if he was properly arrested for a crime unrelated to his disability because it focuses on the defendant's failure to accommodate the plaintiff

in the manner in which the arrest was carried out. *Id.* However, a defendant's duty to accommodate a disabled individual only arises if the defendant knows that the individual is disabled, "either because that disability is obvious or because the individual (or someone else) has informed the [defendant] of the disability." *Robertson v. Los Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007) (declining to dismiss failure to accommodate ADA claim because issues of fact remained as to whether arresting deputy, booking officer, and detention officers knew arrestee was deaf).

Defendants appear to argue that the plaintiffs cannot plausibly allege that the SROs had knowledge of M.P.'s disability if plaintiffs do not allege that the SROs were told what disability M.P. had been diagnosed with and whether that diagnosis is considered a disability under the ADA. *See, e.g.,* Docket No. 47 at 5-6 ("nowhere in [Docket No. 18 at 4-5, ¶ 23] is it alleged that the SROs were specifically told of M.P.'s ADA disability or disability-related behavior changes . . . or what exact ADA recognized disability M.P. was allegedly suffering from."). However, defendants provide no authority supporting the argument that officers must know what disability an arrestee is diagnosed with to be liable for failing to accommodate that disability during an arrest.[7]

_____

[7] Defendants' only citation on this point is to *Scott v. City of Albuquerque,* 2015 WL 13664175 at *17 (D.N.M. Aug. 17, 2015). Docket No. 28 at 13. There the court found that, while the defendant SRO "was aware of at least some of [plaintiff's] mental health problems, there is simply nothing in the evidence that would suggest [the SRO] knew [plaintiff] was disabled as defined by the ADA." *Scott,* 2015 WL 13664175 at *17. The court found that the SRO therefore did not fail to reasonably accommodate plaintiff's disability because he did not know that plaintiff was disabled and required accommodations. *Id.* However, the Tenth Circuit made it clear on appeal that the determinative question of fact was not whether the SRO was aware that plaintiff's disability was covered by the ADA, but rather whether the SRO was aware that plaintiff required an accommodation because of a disability. *Scott,* 711 F. App'x at 885 ("knowledge of [plaintiff's] diagnosis, without more, would not necessarily make [defendant officer] aware that [plaintiff] needed an accommodation") (citing *J.V. v.*

Defendants further argue that plaintiffs' ADA claim fails because the "Amended Complaint does not allege that at any point during this incident the SROs were told by anyone that M.P. was suffering from any disability." Docket No. 28 at 12. However, the complaint states that Principal Alfonso told the SROs that M.P. had a disability when he directed them to go to the stairwell at the end of the building to prevent M.P. from exiting. Docket No. 18 at 4-5, ¶ 23. Furthermore, even if the SROs had not been told by anyone that M.P. suffered from a disability, they could still be found to have knowledge of the disability if it was obvious. *Robertson,* 500 F.3d at 1196. Plaintiffs argue that "it was obvious that M.P. had disability-related behaviors that warranted accommodations because [the SROs] witnessed it [sic] and were directed by school staff to remain outside the room while staff implemented M.P.'s behavior support techniques." Docket No. 39 at 11.

Defendants maintain that "[b]ecause the SROs were witnessing M.P. engage with teachers in the room does not establish the SROs were aware of M.P.'s alleged ADA recognized disability," noting that "not every behavioral issue by a school-age child is classified as a disability by the ADA." Docket No. 47 at 6. However, courts consider the totality of the circumstances when determining whether the need to accommodate a disability was obvious. *See Robertson,* 500 F.3d at 1198. Here, plaintiffs allege that the SROs were informed by the principal that M.P. had a disability, that the SROs were

---

*Albuquerque Public Schools*, 813 F.3d 1289, 1299 (10th Cir. 2016) ("[A]n ADA plaintiff must show an obvious need for an accommodation")). Accordingly, defendants' citation to the district court's decision in *Scott* does not support defendants' argument that plaintiffs' failure to accommodate claim fails because plaintiffs have not alleged the SROs knew M.P.'s diagnoses.

instructed to stay outside the separate room while the teachers implemented a predetermined behavioral intervention plan, and that the SROs witnessed both M.P.'s emotional dysregulation in the separate room and the teachers' implementation of the predetermined behavioral intervention plan to help M.P. calm down.  Docket No. 18 at 4-5, ¶¶ 23, 27.  Assuming the truth of plaintiffs' well-pleaded complaints, the Court finds that, given the totality of the circumstances, plaintiffs have plausibly alleged that the SROs had knowledge of M.P.'s disability.

Defendants do not challenge whether plaintiffs plausibly alleged that the SROs failed to reasonably accommodate M.P.'s disability or that M.P. suffered greater injury or indignity than other arrestees.  Docket Nos. 28, 47.  Accordingly, the Court finds that plaintiffs have plausibly alleged violations of the ADA and RA on the basis of the SROs' failure to accommodate M.P. during his investigation and arrest.

### C.  Failure to Train SRO Tope and SRO Ponce

Plaintiffs allege that Chief Jones is liable for the SROs' alleged violations of the ADA because he failed to train them to appropriately interact with and accommodate students with disabilities.  Docket No. 18 at 13-14, ¶¶ 57-59.  The Tenth Circuit uses § 1983 caselaw to analyze failure-to-train ADA claims.  *J.V.*, 813 F.3d at 1298. Accordingly, a plaintiff seeking to bring such a claim must demonstrate that the defendant had notice of the need for more or better training.  *Id.; see also Cropp v. Larimer Cnty., Colo.,* 793 F. App'x 771, 785 (10th Cir. 2019) (unpublished) ("as a threshold matter, [plaintiff] must demonstrate that [defendant] was on notice of the need for more or better training" (internal quotation and citation omitted)).  Plaintiffs claim that Chief Jones is liable under the ADA for failing to properly train the SROs on interacting

with students with disabilities.  Docket No. 18 at 13, ¶¶ 57-58; Docket No. 39 at 13-16.

As with their § 1983 failure to train claim, plaintiffs argue that the complaint adequately

alleges that Police Chief Jones had notice that more or different training was needed

because of unspecified "statistical data and specific incidents" as well a national studies

and news articles relating to interactions between SROs and students with disabilities.[8]

Docket No. 39 at 14-16.  Accordingly, the Court finds that plaintiffs have failed to

plausibly allege a claim for failure to train under the ADA for the same reason that they

have failed to plausibly allege a claim for failure to train under § 1983, namely, that they

have not alleged that Chief Jones had notice of the need for more or different training.

### D.  Compensatory Damages

A plaintiff may recover compensatory damages under Title II of the ADA if there

is a showing of intentional discrimination.  *Powers v. MJB Acquisition Corp.,* 184 F.3d

1147, 1153 (10th Cir. 1999).  "[I]ntentional discrimination can be inferred from a

defendant's deliberate indifference to the strong likelihood that pursuit of its questioned

policies will likely result in a violation of federally protected rights."  *Id.*  To demonstrate

that a defendant acted with deliberate indifference, a plaintiff must show that the

defendant (1) knew that harm to plaintiff's federally protected right was likely and (2)

failed to act on that knowledge.  *Barber ex rel. Barber v. Colo. Dep't of Revenue,* 562

F.3d 1222, 1229 (10th Cir. 2009).

---

[8] Plaintiffs note that Judge Martinez sustained an ADA claim based on the failure to train SROs on the strength of allegations that "are substantially similar to the allegations included in Plaintiffs' Amended Complaint."  Docket No. 39 at 15-16. However, the plaintiff in that case cited statistics collected by the defendant school district concerning interactions between SROs and students in that district and the complaint also described multiple incidents that had occurred at other schools in the district.  *A.V.*, 586 F. Supp. 3d at 1060.  Accordingly, *A.V.* is distinguishable.

Plaintiffs seek compensatory damages on the basis that SRO Tope and SRO Ponce "knew that accommodations were necessary . . . but were indifferent to an obvious risk of not providing the accommodations."  Docket No. 18 at 13-15, ¶¶ 55, 67. Defendants argue that plaintiffs are not entitled to compensatory damages for two reasons.  First, they claim that "no clear Supreme Court or Tenth Circuit precedent exists as to this issue."  Docket No. 28 at 16-17.  However, as defendants themselves point out, numerous circuit courts have concluded that the ADA provides for respondeat superior liability and Judge Martínez applied such liability in *A.V.  A.V.,* 586 F. Supp. 3d at 1067; *see also Rosen v. Montgomery Cnty.,* 121 F.3d 154, 157 n.3 (4th Cir. 1997) ("Under the ADA . . . liability may be imposed on a principal for the statutory violations of its agent"); *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574-75 (5th Cir. 2002) (following the precedent set by other circuits that "under [ ] the ADA . . . the public entity is liable for the vicarious acts of any of its employees as specifically provided by the ADA") (emphasis omitted); *DeVito v. Chicago Park Dist.*, 83 F.3d 878, 881 (7th Cir. 1996) ("the ADA imposes respondeat superior liability on an employer for the acts of its agents"); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) ("we apply the doctrine of respondeat superior to claims brought directly under" the ADA and RA) (emphasis omitted); *Mason v. Stallings,* 82 F.3d 1007, 1009 (11th Cir. 1996) ("We agree with the Seventh Circuit that the 'agent' language was included [in the ADA] to ensure respondeat superior liability of the employer for the acts of its agents, a theory of liability not available for 42 U.S.C. § 1983 claims.") (emphasis omitted).  In the absence of any Tenth Circuit decision to the contrary and in light of the cases cited above, the Court will decline to dismiss plaintiffs' claim for compensatory damages.

Defendants' only other argument regarding plaintiffs' claim for compensatory damages is that plaintiffs are unable to prove deliberate indifference because they are unable to show that the SROs had knowledge of M.P.'s disability.  Docket No. 47 at 8-9. As described above, the Court finds that plaintiffs have plausibly alleged that the SROs did have knowledge of M.P.'s disability.  Therefore, the Court will not dismiss plaintiffs' claim for compensatory damages on this ground.

Defendants do not challenge the adequacy of plaintiffs' allegation that SRO Tope and SRO Ponce failed to act on their knowledge that failing to accommodate M.P.'s disability would likely harm his federally protected rights.  Accordingly, the Court finds that plaintiffs have plausibly alleged entitlement to compensatory damages.

## V.  CONCLUSION

Therefore it is

**ORDERED** that Defendants Jones, Tope, and Ponce's Motion to Dismiss Plaintiffs' Amended Complaint and Jury Demand (ECF 18) [Docket No. 28] is **GRANTED in part** and **DENIED in part.**  It is further

**ORDERED** that plaintiff's third cause of action is **DISMISSED** as to defendant Terrence Jones.

DATED September 12, 2023.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge